**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Steven C. GRIFFIN, Marvin M. Rux, and
Andrae Scurlock, Defendants–
Appellants.**

**Appeal of Stanley L. Hill.**

**No. 94–3846.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 8, 1995.

Decided May 22, 1996 *.

As Amended June 3, 1996.

---

* This is an appeal from an order of contempt issued by the district court following a posttrial proceeding. The appeal from that order was consolidated with the appeals of the three defendants in the underlying criminal case pursuant to Fed.R.App.P. 3(b). We view the issues raised in Stanley Hill's appeal as sufficiently important to warrant treatment in a separate decision.

Patrick M. Collins (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, Barry Rand Elden, Chief of Appeals, Office to the United States Attorney, Criminal Appellate Division Chicago, IL, for United States.

David C. Thomas (argued), Chicago–Kent College of Law, Chicago, IL, for Stanley L. Hill.

Before KANNE and DIANE P. WOOD, Circuit Judges, and SKINNER, District Judge.**

KANNE, Circuit Judge.

A jury trial presents the inevitable tension between the necessary control a district judge must exercise to achieve the fair presentation of evidence in an impartial forum and the methods for the submission of evidence used by counsel in aggressive representation of their clients. Experienced trial lawyers know that the adversarial nature of a trial—particularly in the presence of a jury—provides an opportunity to achieve an advantage for their clients if they can gain control of the forum. On the other hand, experienced federal trial judges are not unfamiliar with the range of tactics trial lawyers engage in to advance their clients' interests. At bottom, of course, it is not the advocate but the adjudicator who must regulate the conduct of the proceeding to guarantee a fair trial. The ultimate means of ensuring the judge's control of the trial is the power of direct contempt—an extraordinary power which must be exercised with appropriate discretion.

Stanley L. Hill is a member of the Illinois Bar who engaged in obdurate behavior in the course of defending his client against assorted criminal charges. Rather than proceeding summarily against Mr. Hill and interrupting the multi-defendant criminal trial, the district judge waited until after sentences were imposed and then issued an order directing Mr. Hill to show cause why he should not be held in contempt for his conduct during the trial. After receiving his written and

oral responses, the district judge found Mr. Hill in direct contempt of court. We are asked in this appeal to examine both the procedural sufficiency of Mr. Hill's contempt judgment and the basis in the record for the district judge's finding of contempt as a matter of law. Upon our review of the record, we find that the district judge did not deny Mr. Hill the process due him under applicable law and that the record demonstrates an evidentiary basis sufficient to sustain an adjudication of criminal contempt.

I

A grand jury sitting in Chicago handed down an indictment charging Marvin M. Rux and two others with twenty-three counts of unlawful activity stemming from their alleged conspiracy to distribute cocaine. The grand jury specifically charged Rux with aiding and abetting the conspiracy, knowingly engaging in financial transactions to launder proceeds of cocaine distribution, and structuring transactions so as to evade the currency transaction reporting requirements of federal law. Mr. Hill was appointed to represent Rux in the ensuing jury trial conducted before Judge James B. Zagel in the Northern District of Illinois.

The prosecution came to trial armed with an impressive amount of inculpatory evidence concerning the unlawful activities of Rux and his two codefendants. Included in this body of evidence was the testimony of Special Agents Kevin Moss and William Maloney of the Internal Revenue Service's Criminal Investigation Division. It was during Mr. Hill's cross-examination of these two witnesses that the events leading to the finding of contempt took place.

A

The first two specified instances of contempt occurred during the cross-examination of Agent Moss. The government called Agent Moss as an expert on the unlawful practices of money laundering and structuring.

** Hon. Walter Jay Skinner, U.S. District Judge for the District of Massachusetts, sitting by designation.

ing.[1] On direct examination by Assistant U.S. Attorney Scott, Agent Moss explained certain terms used in the description of money laundering and structuring offenses codified at 18 U.S.C. §§ 1956, 1957 and 31 U.S.C. §§ 5311–5324. He also described the means and methods by which persons attempt to conceal the profits of criminal enterprises and the efforts of the federal government to identify and investigate these activities. At no time did the government ask Agent Moss about any of the evidence specifically pertaining to the transactions that formed the heart of the government's case against Rux.

### 1. *The first instance of contempt*

Mr. Hill repeatedly asked Agent Moss on cross-examination whether the government had asked him to examine any of the financial records involved in the present case. These questions before the jury elicited repeated objections from AUSA Scott, which Judge Zagel sustained.

BY MR. HILL:

Q. Have you had occasion to look at the real estate transactions in this case?

MS. SCOTT: Objection, Judge. He said he didn't know anything about the case.

MR. HILL: He didn't say—

THE COURT: Objection is sustained.

BY MR. HILL:

Q. All right. Your testimony is talking. generally about what you know from other cases, correct?

A. From my experience.

Q. Now, has the government asked you as a result of your expertise to look at the transactions involving Marvin Rux?

A. No.

MS. SCOTT: Judge, we've been over this.

THE COURT: Objection is sustained.

BY MR. HILL:

Q. I mean, you have been involved in other cases where you've been asked to look at financial transactions to see whether they were legal or not, haven't you?

MS. SCOTT: Objection, Judge.

THE COURT: Sustained.

\* \* \* \* \* \*

BY MR. HILL:

Q. Let me just ask you this one last question. Have you been asked to review any transactions involving Marvin Rux, sir?

MS. SCOTT: Judge, objection.

THE COURT: Are you including—

MR. HILL: Last question. Any transactions involving Marvin Rux, the defendant in this case.

THE COURT: Come to the side.

MR. HILL: I'll withdraw the question.

THE COURT: Come to the side.

At the sidebar conference, Judge Zagel told Mr. Hill that his questions were designed to put the government on trial—a tactic Judge Zagel said he would not allow. It was during this same sidebar conference that Mr. Hill made a request that led to the second instance of contempt.

### 2. *The second instance of contempt*

Judge Zagel suggested to Mr. Hill at the sidebar conference that he was doing no service to his client because the government could easily ask Agent Moss to examine and testify about the records of the transactions.

THE COURT: The government is not on trial here. Whether the government asks a witness to do something or doesn't ask a witness to do something doesn't amount to a hill of beans. We all come in here with the same subpoena power and the same ability, at least in theory, to get in evidence, and I don't want lawyers standing up in closing argument and saying, well, if they thought it was so important why didn't they ask, and they respond to you by saying, if Mr. Hill thought it was so important why didn't Mr. Hill ask, and then we have a dispute over not the defendant's guilt but which lawyers the jury likes the most.

MR. HILL: Judge, I'd like to make a request at this point.

---

**1.** "Structuring" is used in 31 U.S.C. § 5324 to describe any of several actions taken to evade the currency transaction reporting requirements set out at 31 U.S.C. §§ 5313, 5325.

THE COURT: Now you may make your statement.

MR. HILL: I'd like to make a request at this point. I'd like to have him review the real estate transactions in this case and make a statement as to whether or not there's money laundering.

THE COURT: Your request is granted.

The sidebar conference ended, and Agent Moss was then subjected to redirect examination by AUSA Scott and recross by counsel for Rux's codefendants. Judge Zagel then engaged Mr. Hill at a sidebar conference prior to Mr. Hill's opportunity to recross Agent Moss.

THE COURT: Before the witness goes, Mr. Hill, if you want him to pursue this, you may inquire. But then, of course, you're going to have to call him as your witness.

MR. HILL: Okay. Your Honor, I'd like him to be on standby while I make that determination. I'd like to reserve the right to recall him if I need him.

THE COURT: What are you going to ask him?

MR. HILL: Just what you invited me to ask him.

THE COURT: This involves—

MR. HILL: May I make my record, Judge, if I may, so I can be clear?

THE COURT: No, I think what you want to do is you want to have him look at pieces of paper.

MR. HILL: No, that's not what I want to do.

THE COURT: Oh, okay. Then go ahead.

MR. HILL: May I say what I want to do?

THE COURT: Just ask the questions.

MR. HILL: Okay. What I'd like to do, Your Honor, first of all, what I'd like to do—

THE COURT: Right.

MR. HILL:—is that I'd like to ask him, with all of this experience and all of these investigations he's been involved in and all of these reportings and reports that he's done-

THE COURT: Yes.

MR. HILL: He's looked at it for several years.

THE COURT: Right.

MR. HILL: Why he wasn't requested to look at this transaction and give his opinion on that—

THE COURT: That's—

MR. HILL:—since he's the expert in the area.

THE COURT: That's what you wanted to ask?

MR. HILL: That's what I wanted to ask.

THE COURT: Okay. I sustain the objection.

MR. HILL: Thank you. I have no further use of the witness.

THE COURT: Right. You don't want him to make the examination on your behalf?

MR. HILL: Yes. I got that.

Judge Zagel determined from this exchange that Mr. Hill's only purpose in requesting at the sidebar conference that Agent Moss examine the records was to pursue the proscribed line of questioning and that the request constituted a material misrepresentation to the court.

B

The third and fourth specified acts of contempt occurred during Mr. Hill's cross-examination of Agent Maloney, who prior to trial had conducted the very analysis that had concerned Mr. Hill during his cross-examination of Agent Moss. Agent Maloney's testimony was crucial to the government's case against Rux. He analyzed and explained in detail the documentary evidence of the money laundering and structuring transactions.

1. *The third instance of contempt*

The government had qualified Agent Maloney as an expert in money laundering and structuring transactions based upon his training and experience in the IRS. Prior to his cross-examination, Mr. Hill suggested to Judge Zagel that he had a right to inquire into certain grades Agent Maloney had received during his three years of undergraduate study at DePaul University. Mr. Hill

was specifically interested in having the jury hear about Agent Maloney's grades in economics and accounting. Judge Zagel denied Mr. Hill's request to ask Agent Maloney about his academic record and admonished Mr. Hill to adhere to the court's ruling:

My ruling is this, and let me tell you the reasons for it. If you wish to challenge whatever statement he made about the amount of time he had in college, you may do so. If you wish to challenge what his grades were in various courses, you may not do so. *And I'm cautioning you, Mr. Hill, that I don't want you to ask a question which conveys any information about his grades.* (emphasis added)

Judge Zagel explained that Agent Maloney's grasp of accounting principles was not an issue and that it was during his employment with the IRS that Agent Maloney received the training needed for his role in the present case. Mr. Hill's subsequent cross-examination of Agent Maloney drew objections from Assistant U.S. Attorney Safer and manifested a complete disregard of Judge Zagel's ruling and admonition.

BY MR. HILL:

Q. Was there a time when you had to matriculate at Wright Junior College, sir?

A. That is correct.

Q. Would you tell the ladies and gentlemen of the jury why.

MR. SAFER: I object, Your Honor.

THE COURT: The objection is sustained.

BY MR. HILL:

Q. Have you taken any accounting courses, sir?

A. Yes.

MR. SAFER: Objection, Your Honor.

THE COURT: Mr. Hill, come to the side.

MR. HILL: I'm not getting into grades.

THE COURT: Mr. Hill, come to the side.

At the sidebar conference, Judge Zagel let Mr. Hill know that he viewed Mr. Hill's statement about grades, which was made in front of the jury, to be in direct defiance of the court's express instructions. Judge Za-

gel then excused the jury so that he and counsel could discuss the matter in greater detail. In the face of the court's prior admonition and repeatedly sustained objections, Mr. Hill's persistent questioning of Agent Maloney on the subject of grades was ultimately determined by Judge Zagel to have exceeded the bounds of vigorous advocacy.

### 2. *The fourth instance of contempt*

For the sake of brevity, we will not reproduce the conversation between Mr. Hill and Judge Zagel that transpired after the jury had been excused. Judge Zagel told Mr. Hill that he considered the questioning about Agent Maloney's grades to be another example of Mr. Hill's continuing effort to circumvent the rulings of the court concerning those matters that should not be put before the jury. In response, Mr. Hill launched into a monologue on the mandates of the Sixth Amendment, the need to demonstrate for the jury the "objective reality" of the situation, and the noble traditions of American trial advocacy. At the start of his statement, Mr. Hill made the following request:

Jim Tunick [Mr. Hill's cocounsel for Rux] and I would like to withdraw from this case at this point because I think that by virtue of your ruling I'm being intimidated to the point of where I can't effectively represent my counsel—I mean my counsel who happens to be my client.[2]

Judge Zagel responded that he did not believe Mr. Hill was intimidated, and he directed Mr. Hill to comply with the rulings of the court. He also promised to "deal later with what has happened thus far with respect to this ruling."

### C.

Judge Zagel lived up to his promise. On the day he sentenced Rux, September 2, 1994, he also issued an order to show cause why Mr. Hill should not be found in contempt of court based upon the four specified acts described above.[3] Mr. Hill filed a response to the order on October 3, in which he

---

**2.** At the time of trial, Marvin Rux was an attorney licensed to practice in Illinois.

**3.** This order was styled as a "Rule to Show Cause," but we refer to it as an order consistent with the language of Fed.R.Crim.P. 42(b).

stated that the allegations contained in the order to show cause neither charged nor demonstrated the requisite elements of direct criminal contempt. On October 30, Mr. Hill filed a motion for referral of the contempt matter to another judge of the Northern District of Illinois pursuant to FED. R. CRIM. P. 42(b).

Judge Zagel conducted a hearing on the contempt matter on November 4, at which Mr. Hill was represented by counsel. Judge Zagel orally denied the motion for referral, stating that he did not view Mr. Hill's conduct as disrespect or criticism of him as a judge but rather as "simple disobedience of the Court's rulings." He also stated that he had searched his own conscience and believed that he could fairly and impartially adjudicate the matter. Mr. Hill offered no oral defense to the charge of contempt at the hearing; he chose to rely upon his written response to the order and the record.

Later that same day, Judge Zagel issued a final order in which he found Mr. Hill guilty of contempt on the basis of the conduct outlined above. The order concludes:

> I therefore find beyond a reasonable doubt that Mr. Hill has committed direct contempt of court with the specific intent to prejudice a fair and impartial hearing in the following ways:
>
> 1. Refusing to abide by the rulings of the Court with respect to the admissibility

of the fact that the government did not ask Kevin Moss to give certain expert testimony.

> 2. Misrepresenting to the Court that he did want Kevin Moss to examine records and state opinions when Mr. Hill knew he wanted neither of these things.
>
> 3. Refusing to abide by the Court's ruling that William Maloney's academic performance was inadmissible.
>
> 4. Misrepresenting to the Court that he was intimidated by the Court's rulings when he was not intimidated and he knew he was not intimidated.

Judge Zagel decided that publication of the order would suffice as punishment for Mr. Hill's contempt, and he denied Mr. Hill's motion for reconsideration on November 17.[4] Mr. Hill filed a timely notice of appeal on November 24, 1994. We have jurisdiction to hear his appeal according to 28 U.S.C. § 1291.

## II

Mr. Hill assigns procedural error in the contempt proceedings and claims there was insufficient evidence to support the finding of contempt. Before addressing the merits of Mr. Hill's procedural challenge, we are obliged to identify the procedural basis for the district court's hearing and final order.[5] FED.R.CRIM.P. 42 outlines the methods of dealing with direct criminal contempt. Rule

---

4. We are at a loss to understand any basis under federal law or rules of criminal procedure for what is typically described as a "motion to reconsider," nor have we any record of such a motion aside from the docket entry of November 17, in which Judge Zagel denied the "Motion of Respondent Stanley L. Hill for Reconsideration." Hill has not argued this point on appeal, and so we need not address it. There is, however, a question of legal etymology that warrants attention.

There is no authority in the Federal Rules of Criminal Procedure for a "motion for reconsideration." Rules 29, 33, 34, and 35 of the Criminal Rules do allow motions for judgment of acquittal after a jury verdict of guilty, new trial, arrest of judgment, and correction or reduction of sentence, respectively. In addition, other avenues of postconviction relief are available through Title 28 of the United States Code. See 28 U.S.C. §§ 2242, 2255. None of these mechanisms require the court to reconsider the merits of the underlying judgment.

But cf. United States v. Dieter, 429 U.S. 6, 8-9 & n.3, 97 S.Ct. 18, 19 & n.3, 50 L.Ed.2d 8 (1976) (implying that motions to reconsider are viable creatures by way of tradition despite the lack of any provision for them in the statutes or rules); see also United States v. Healy, 376 U.S. 75, 78-79, 84 S.Ct. 553, 555-56, 11 L.Ed.2d 527 (1964).

Hill's motion might properly be characterized as a motion for acquittal under FED.R.CRIM.P. 29 because we will only review sufficiency of the evidence challenges to criminal convictions that have been perfected for appeal through the timely filing with the district court of a Rule 29 motion. United States v. South, 28 F.3d 619, 626 (7th Cir.1994).

5. There was no identification of the procedural rule governing the contempt proceedings or attempt to classify Hill's conduct under the relevant statute, 18 U.S.C. § 401, which describes three species of contempt.

42(a) allows for summary adjudication of contempt occurring in the presence of the court if "the judge saw or heard the conduct constituting the contempt." FED.R.CRIM.P. 42(a). According to Rule 42(b), all criminal contempts except those addressed summarily under Rule 42(a) "shall be prosecuted on notice." FED.R.CRIM.P. 42(b). This language suggests that Rule 42(b) governs the adjudication of all nonsummary criminal contempts. Neither the district judge's order to show cause nor his finding of contempt referenced Rule 42(b), and while no prejudice flowed from this omission, we think it would have been appropriate for the trial judge clearly to identify the particular procedural basis governing the contempt proceedings.

Mr. Hill's first argument is that the district judge denied him the process envisioned by FED.R.CRIM.P. 42(b). He states that the order to show cause failed to specify the alleged contempt as "criminal" and thus did not constitute the notice required by Rule 42(b). Mr. Hill also asserts that Judge Zagel abrogated the due process embodied in the text of Rule 42(b) when he both prosecuted and adjudicated the contempt proceeding. Mr. Hill contends that Judge Zagel had "predetermined issues essential to decision of the Rule," and that this fact, combined with the other assigned deficiencies, rendered the hearing a "sham." Mr. Hill concludes that he was denied the process due those charged with contempt under FED.R.CRIM.P. 42(b) and the right to a fair and impartial adjudicator at the contempt hearing. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 808–14, 107 S.Ct. 2124, 2138–41, 95 L.Ed.2d 740 (1987).

### A

Mr. Hill's notice argument is inconsistent with common sense and contrary to established precedent. The essence of FED. R.CRIM.P. 42(b) is that an alleged contemnor be provided with notice and an opportunity for a fair and impartial hearing. A necessary component of this process is that the notice state with particularity the facts constituting the alleged contempt:

A criminal contempt except as provided in subdivision (a) of this rule shall be prose-

cuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such.

■ FED.R.CRIM.P. 42(b). The order to show cause complied with these requirements. It directed Mr. Hill to show cause why he should not have been held "in direct contempt of court for acting in defiance of the Court's rulings and making misrepresentations to the Court," and it described Mr. Hill's contumacious conduct. It was not necessary for the order specifically to characterize the contempt as "criminal." *United States v. United Mine Workers of America*, 330 U.S. 258, 296, 67 S.Ct. 677, 697, 91 L.Ed. 884 (1947). There is no question that the rule notified Mr. Hill of the pending charge and its essential factual allegations.

One would be credulous to suppose that Mr. Hill was not aware that he was charged with criminal contempt. The purpose of the proceeding was to vindicate the authority of the court—the touchstone of criminal contempt. *See Doe v. Maywood Hous. Auth.*, 71 F.3d 1294, 1297 (7th Cir.1995) (citing *International Union, UMWA v. Bagwell*, —— U.S. ——, ——, 114 S.Ct. 2552, 2557, 129 L.Ed.2d 642 (1994)); see also 3 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 704, at 824–25 nn. 11–12 (2d ed. 1982 & Supp.1995) (collecting cases). The fact that Mr. Hill was provided notice and a hearing should have eliminated whatever doubt he had that the contempt proceeding was criminal in nature. See *Hicks v. Feiock*, 485 U.S. 624, 631, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988) (stating that the substance of the proceeding, among other things, determines whether contempt is civil or criminal).

### B

Mr. Hill claims that Judge Zagel's determination of the issue of contempt violated his right to due process. First, Mr. Hill suggests that it is improper for a judge to both prosecute and adjudicate the issue of contempt. Second, he suggests that Judge Zagel should have disqualified himself because

he had already decided issues crucial to any finding of contempt. Mr. Hill's arguments suffer from tenuous reliance on inapposite case law and a misunderstanding of the procedural requirements for determination of criminal contempt.

### 1. *The adjudication of contempt*

██ It was entirely proper for Judge Zagel to have decided the issue of contempt. Article III courts and the judges appointed pursuant to Article III are vested with the "judicial power," which is the power to decide those cases and controversies that fall under one of the enumerated categories of jurisdiction. U.S. CONST. art. III, §§ 1, 2; 28 U.S.C. § 1331. The Supreme Court has consistently stated that the power to punish contempt is part and parcel of the judicial power. *Young*, 481 U.S. at 800, 107 S.Ct. at 2134; *Michaelson v. United States ex rel. Chicago, St. P., M., & O. Ry. Co.*, 266 U.S. 42, 65–66, 45 S.Ct. 18, 19–20, 69 L.Ed. 162 (1924). This is reinforced by the language of 18 U.S.C. § 401, which gives a court discretion to punish contempt for its authority as iterated in subsections (1), (2), and (3). Mr. Hill borrows several passages from Justice Scalia's concurring opinion in *Young*, 481 U.S. at 815, 107 S.Ct. at 2142, to suggest the inherent impropriety of Judge Zagel's role in the instant case.

Neither the holding in *Young* nor Justice Scalia's concurring opinion are on point. The Court in *Young* was faced with the appointment of counsel for an interested party to prosecute a criminal contempt proceeding. *Id.* at 791–92, 107 S.Ct. at 2129. The majority concluded that "counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order." *Id.* at 809, 107 S.Ct. at 2138. Justice Scalia wrote a concurring opinion in which he stated that the district court's appointment of counsel to prosecute a violation of its earlier order was not an exercise of the judicial power conferred by Article III. *Id.* at 815, 107 S.Ct. at 2142. Mr. Hill's appeal does not present the

situation addressed in *Young*, and Mr. Hill's reliance on that decision is misplaced.

Mr. Hill's contumacious conduct was his direct disobedience of the court's ruling on the scope of cross-examination. Determining Mr. Hill's defiance of that ruling was necessary to protect the court's integrity as a forum for resolving cases and controversies. The evidentiary rulings by Judge Zagel were neither equivalent nor analogous to the judgment at issue in *Young*. Judge Zagel's rulings determined the proper scope of Mr. Hill's cross-examination of Agents Moss and Maloney and are therefore outside the scope of both the majority opinion and Justice Scalia's concurring opinion in *Young*.

This facet of Mr. Hill's argument turns a time-honored metaphor on its head, for Mr. Hill has lost sight of the trees in his search for the forest. He would have us construe the holding in *Young*, which addressed a district court's appointment of prosecutors to prosecute contempt of that court's earlier injunction, 481 U.S. at 790–92, 107 S.Ct. at 2128–30, to prohibit any Article III judge from adjudicating an issue of contempt that he had framed. Mr. Hill attempts to establish this untenable position by relying on several decisions of our Fifth Circuit colleagues.

Neither of the Fifth Circuit cases cited in Mr. Hill's brief is apposite to the facts of this case. In both *American Airlines, Inc. v. Allied Pilots Ass'n*, 968 F.2d 523 (5th Cir. 1992), and *In re Davidson*, 908 F.2d 1249 (5th Cir.1990), district judges conducted contempt hearings in the manner of prosecutors, putting questions to the parties and, in certain instances, dismissing their answers on the spot.[6] *American Airlines*, 968 F.2d at 529; *Davidson*, 908 F.2d at 1251. The proceedings in the case before us are unquestionably different. Judge Zagel did not act as a prosecutor but as the judge who had noted the conduct in question. In fact, he stated at the outset of the hearing that his only purpose was to provide Mr. Hill an opportunity to be heard regarding the specified incidents of conduct. Mr. Hill may re-

---

**6.** While the *American Airlines* case involved alleged misrepresentations similar to the present case, *Davidson* concerned the violation of a temporary restraining order issued by the district court.

gret his failure to use that opportunity to make his case, but his regret does not transmute the nature of the proceeding.

We find support in the Fifth Circuit's own assessment of those cases. It recently declined to apply the disqualification rule of *American Airlines* and *Davidson* in an appeal of a finding of criminal contempt where the district judge asked questions and called witnesses but did not assume a prosecutorial role. *United States v. Time,* 21 F.3d 635, 638–39 (5th Cir.1994). The analysis in *Time* confirms our belief that the crucial determinant in contempt cases is the extent of the judge's intrusion into the sphere of authority delegated to the executive department: the power to execute and enforce federal law. U.S. CONST. art. II, §§ 1, 3. *See* Steven G. Calabresi, *The Vesting Clauses as Power Grants,* 88 NW.U.L.REV. 1377 (1994). This concern, which animated Justice Scalia's concurring opinion in *Young,* is implicated when a district judge clothes himself in the vestments of Article II—which plainly did not happen in the present case.

■ More particularly, both *American Airlines* and *Davidson* involved conduct occurring outside the courtroom, so-called "indirect contempt." "The distinction between in-court and out-of-court contempts has been drawn not to define when a court has or has not the authority to initiate prosecution for contempt, but for the purpose of prescribing what procedures must attend the exercise of that authority." *Young,* 481 U.S. at 800, 107 S.Ct. at 2133. Prosecutions for out-of-court contempt command the trappings of normal adversary procedure. *See Bloom v. Illinois,* 391 U.S. 194, 204, 88 S.Ct. 1477, 1483, 20 L.Ed.2d 522 (1968); *Cooke v. United States,* 267 U.S. 517, 537, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925). The Fifth Circuit determined in *American Airlines* and *Davidson* that the defendants were not afforded those appropriate procedural protections.

■ In the case at bar, the conduct occurred in court during the course of a criminal trial, and Judge Zagel would have been well within his authority to have acted summarily under FED.R.CRIM.P. 42(a). *See Ex parte Terry,* 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888). His decision to postpone action and allow Mr. Hill notice and hearing under Rule 42(b) did not require him to abdicate his authority to conduct the delayed determination.

## 2. *Mr. Hill's right to a fair and impartial adjudicator*

The more serious aspect of Mr. Hill's due process argument is that Judge Zagel was biased and therefore unfit to act as an impartial adjudicator. Mr. Hill suggests that "Judge Zagel had already arrived at judgments against Mr. Hill regarding crucial issues before the so-called hearing took place." He locates evidence of Judge Zagel's predisposition in the order to show cause,[7] the transcript of the contempt hearing, and the text of the order.

Mr. Hill's argument conflates the disqualification provision of Rule 42(b) and the related, though doctrinally independent, rule that an accused has the right to a fair and impartial adjudicator. U.S. CONST. amends. V, VI. The record demonstrates that Mr. Hill preserved both of these arguments for appeal at the district court: in his motion seeking referral of the contempt proceeding to another judge, Mr. Hill relied on the Fifth Amendment and FED.R.CRIM.P. 42(b).

■ A district judge's decision to employ the summary contempt procedures of Rule 42(a) is reviewable for an abuse of discretion. *In re Holloway,* 995 F.2d 1080, 1086 (D.C.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994). The decision to proceed under Rule 42(b) warrants similar review. Once the election is made to proceed under Rule 42(b), however,

---

7. Hill's reference to the order is really a reference to the statements made by Judge Zagel during the sidebar conference following the third specification of contempt (which we have reproduced above) and during the exchange with Hill after the fourth specification of contempt (which we have not reproduced above). Hill suggests that Judge Zagel's statement at sidebar that "I don't care what your intent was because [the question] was in direct defiance[,]" and his later statement that "I don't believe you are intimidated" both manifest judgments as to elements of the offense.

a district judge must decide whether disqualification is necessary. The Supreme Court has stated that the decision whether to assign a Rule 42(b) proceeding to a judge who was not presiding at the time the alleged contempt occurred is discretionary. *Nilva v. United States,* 352 U.S. 385, 396, 77 S.Ct. 431, 438, 1 L.Ed.2d 415 (1957). Therefore, we also review a district judge's decision not to disqualify himself from presiding at a Rule 42(b) proceeding for an abuse of discretion.

■ On appeal, Mr. Hill styles his argument as arising under Rule 42(b), but his allegations of Judge Zagel's bias and partiality go beyond the purview of Rule 42(b). The essence of Mr. Hill's appeal does not involve Rule 42(b) because he does not claim that he criticized or acted with disrespect toward Judge Zagel. He argues that certain of Judge Zagel's statements at the trial and the contempt hearing manifested a predisposition toward a finding of contempt, and Mr. Hill concludes that disqualification was required under those circumstances. He fails to precisely identify the textual basis for this disqualification, but it certainly cannot arise under the plain language of Rule 42(b).

■ The record does not manifest criticism or disrespect of Judge Zagel by Mr. Hill, except under a theory that disrespect obtains in every violation of a district judge's order. This theory is untenable. Mere violations of a judge's orders cannot, without more, constitute the disrespect or criticism imagined by those who drafted Rule 42, for otherwise a judge who witnessed contemptuous conduct appropriate for summary disposition is disqualified from adjudicating that contempt in an ancillary proceeding under Rule 42(b). This is not the case. *See Sacher v. United States,* 343 U.S. 1, 9–10, 72 S.Ct. 451, 455, 96 L.Ed. 717 (1952) (stating that district judge may defer adjudication of contempt until after completion of trial). This conclusion would undermine the logical basis for the disqualification provision of Rule 42(b), and we will not impute such an error to the drafters.

Rule 42(b) is not the sole basis for judicial disqualification, however, and Mr. Hill's argument is sufficiently ill defined that we feel constrained to address in general fashion his allegations of Judge Zagel's bias and partiality. We will determine whether the record shows the genesis or development of a personal animus between Judge Zagel and Mr. Hill that would, *ex ante,* undermine our confidence in Judge Zagel's ability to maintain the integrity of the judicial role during the contempt proceedings.

■ Any proceeding is fundamentally and irreparably flawed if conducted by a judge who is unable dispassionately to vindicate the interests of the court and the accused. *Ungar v. Sarafite,* 376 U.S. 575, 588, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964). The flaw in such a proceeding does not depend upon the result, for some errors "are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). The threat of such fundamental error obtains where there exists "such a likelihood of bias or an appearance of bias" that the judge is unable to perform the judicial function. *Taylor v. Hayes,* 418 U.S. 488, 501, 94 S.Ct. 2697, 2704, 41 L.Ed.2d 897 (1974) (quoting *Ungar,* 376 U.S. at 588, 84 S.Ct. at 849).

■ The requirement that only an appearance of bias suffices to warrant disqualification underscores the elemental truth that in a judicial proceeding, as in most other interactions between the individual and the state, appearances do matter. *See Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13–14, 99 L.Ed. 11 (1954) (stating that "justice must satisfy the appearance of justice"). The disqualification calculus does not concern what is in the mind of the judge, nor does it prescribe some subjective test by which one might measure the probability of bias or prejudice. Instead, it says that a judge should be disqualified from a proceeding where the circumstances raise reasonable questions about his impartiality, regardless of his state of mind or ability to conduct a fair and impartial hearing.

■ There is no reasonable inference to be drawn from the record that Judge Zagel became "personally embroiled" with Mr. Hill

or descended into "intemperate wrangling." *See Ungar,* 376 U.S. at 585, 84 S.Ct. at 847. The record does indeed illustrate Judge Zagel's frustration with Mr. Hill's continued efforts to circumvent the court's rulings. An appointment under Article III does not divest a judge of human reaction, and nothing in the record suggests that Judge Zagel's understandable frustration at trial tainted his ability to discharge his judicial duty at the posttrial contempt hearing. The Supreme Court recently spoke to this very point in a case involving the extrajudicial source doctrine of 28 U.S.C. § 455(a):

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.... *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.

*Liteky v. United States,* 510 U.S. 540, ——, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994).

Our confidence in the fairness and impartiality of the temporally removed contempt proceeding is buttressed by Judge Zagel's restraint in sentencing Mr. Hill, which is a final illustration of the even temperament that he demonstrated throughout these proceedings. Referral of criminal contempt proceedings to another judge is necessary only when the record demonstrates the likely presence of personal animosity between the trial judge and the contemnor, and there is no evidence of any animosity in this case.

As a basis for disqualification Mr. Hill identifies Judge Zagel's predisposition to hold him in contempt based upon his statement that he did not care what Mr. Hill's intent was in making the statement about grades and his expression of skepticism concerning Mr. Hill's assertion of intimidation. Judge Zagel's comments neither amounted to a final determination of Mr. Hill's contumacious conduct nor manifested a state of mind that raises questions about Judge Zagel's ability to impartially adjudicate the contempt. What the remarks may demonstrate, if anything, is that Judge Zagel was tempted to act summarily under FED.R.CRIM.P. 42(a), which would have been well within his discretion to do.

Judge Zagel acknowledged as much during the contempt hearing: "It was my view that what occurred here would have been appropriate for summary disposition." Mr. Hill seems to think that this remark, considered in the light of Judge Zagel's prior statements, fatally undermines the integrity of the hearing. Leaving aside Mr. Hill's ill-advised "sham" rhetoric, the excerpted statement demonstrates that Judge Zagel exercised considerable restraint in not acting summarily and, in fact, gave Mr. Hill more than was his due. This restraint reflects Judge Zagel's concern that the contempt proceeding not mar the efficient disposition of the complex underlying criminal proceedings, and we applaud his priorities. *See In re Ellenbogen,* 72 F.3d 153, 156 (D.C.Cir.1995).

■ Mr. Hill also claims that the "sham" nature of the hearing is revealed by its brevity and the fact that the district court issued the contempt order on the same day with no reference to Mr. Hill's defense. This argument suffers from a faulty premise. As the government noted and the record makes clear, Mr. Hill failed to offer any defense at the hearing. This explains both the hearing's brevity and the prompt issuance of the order because the district court did not need to address or incorporate any matters that were not contained in Mr. Hill's earlier written submission. Mr. Hill's memorandum of law in support of his response to the order to show cause sketched an outline of what might have been a colorable defense, namely, the district court's failure to allege the requisite elements of contempt under § 401 and the lack of substantive evidence of his contumacious intent. Mr. Hill's memorandum, however, cites to cases that are inapposite to his stated conclusions. Bare conclusions do not suffice as a defense. And as we discuss below, the order contained findings sufficient to support a finding of criminal contempt.

### III

■ An act of criminal contempt under 18 U.S.C. § 401, similar to substantive crimi-

nal offenses, must be proved beyond a reasonable doubt. Mr. Hill states that the evidence is insufficient to support the finding of contempt. In reviewing Mr. Hill's adjudication of contempt for sufficient evidence, our task is to "determine whether any reasonable trier of fact could have been convinced of guilt beyond a reasonable doubt." *Doe,* 71 F.3d at 1297. We defer to the district judge's credibility determinations because of his familiarity with the record and his ability to personally observe the demeanor of the contemnor. *See United States v. Messino,* 55 F.3d 1241, 1252 (7th Cir.1995).

Before examining the sufficiency of the evidence, we must ascertain what elements of proof are required for the substantive aspects of the contempt. Mr. Hill argues that the district court asserted contempt under 18 U.S.C. § 401(1), and the government argues that the contempt arose under § 401(3).[8] The text of § 401 reads:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401. This statute suggests but does not explicitly define certain elements of proof in subsections (1) and (3), namely, the *mens rea* and result requirements. The courts have responded to these ambiguities by defining the requisite culpability and result requirements for subsections (1) and (3) of § 401. The parties' dispute over which section provided the basis for Judge Zagel's decision has dispositive implications primarily because of the different result requirements for each subsection. *Compare United States v. Seale,* 461 F.2d 345, 366–67 (7th Cir.1972) (requiring proof of misbehavior resulting in an intentional obstruction of justice in the presence of the court for a conviction under § 401(1)),[9] *with Doe,* 71 F.3d at 1297 (requiring proof of willful violation of a lawful and reasonably specific order of the court for a conviction under § 401(3)). The crucial difference between subsections (1) and (3) for our purposes is the objective result requirement regarding obstruction of justice in subsection (1) and the lack of such a requirement in subsection (3). *See United States v. Oberhellmann,* 946 F.2d 50, 52 (7th Cir.1991).

Neither the order to show cause nor the determination of contempt cites a subsection of § 401. The order to show cause describes the contempt only as "direct." Both in his response to the order to show cause and in his brief to this court, Mr. Hill has classified the contempt as "misbehavior" falling under § 401(1) and requiring a more rigorous evidentiary showing.[10] The government understandably seeks to characterize the contempt as "defiance," which would involve the lesser showing mandated by § 401(3). Our colleagues in other circuits have grappled with

---

**8.** We need not address § 401(2), which applies to the official transactions of officers of the court, because attorneys are not officers of the court as that term is used in § 401(2). *Holloway,* 995 F.2d at 1081–82 (citing *Cammer v. United States,* 350 U.S. 399, 404–05, 76 S.Ct. 456, 458–59, 100 L.Ed. 474 (1956)).

**9.** We were faced in the 1970s case of *Seale* with a choice between the strict requirement of wrongful intent employed by several circuits (including our own) and the two-part test announced in *Offutt v. United States,* 232 F.2d 69 (D.C.Cir.), *cert. denied,* 351 U.S. 988, 76 S.Ct. 1049, 100 L.Ed. 1501 (1956), in which the District of Columbia Circuit reasoned that where "clearly blameworthy" conduct is present, no finding of intent to obstruct is necessary. 232 F.2d at 72. Faced with the turbulent times, we decided in

*Seale* that the appropriate approach was to require a specific finding of intent to obstruct in every case. 461 F.2d at 367–68. So we held that while subsection (3) requires only a willful violation (i.e., knowing as to the conduct and the circumstance), subsection (1) requires specific intent to obstruct justice (i.e., intentional as to the conduct and the result) and an actual obstruction. Whether that vestige of 1970s jurisprudence is sound awaits another case.

**10.** Hill has not argued that the district court erred in failing to identify the relevant subsection of § 401, and we note that whatever error may have existed did not prejudice Hill in any fashion because his response to the order anticipated the elements of proof required by subsections (1) and (3).

similar nonspecificity and have determined *de novo* the statutory basis for the contempt. *See In re Levine,* 27 F.3d 594, 595–96 (D.C.Cir.1994) (per curiam), *cert. denied,* —— U.S. ——, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995); *Time,* 21 F.3d at 641; *Holloway,* 995 F.2d at 1082–86. We will do the same.

The district judge's order suggests that he viewed Mr. Hill's conduct as violating § 401(1); it describes Mr. Hill as having committed direct contempt of court "with the specific intent to prejudice a fair and impartial hearing" and details the disruptions occasioned by Mr. Hill's conduct. A violation of § 401(3) requires only willful disobedience of a court order, *Doe,* 71 F.3d at 1297; there is no result requirement. Under § 401(1), the misbehavior must "rise to the level of an obstruction of the administration of justice," *Seale,* 461 F.2d at 367 (internal quotes and brackets omitted), in addition to being intentional. Thus, § 401(1) requires both a subjective and objective finding by the district court.

 We conclude from the record that there is a sufficient quantum of evidence to demonstrate Mr. Hill's violation of § 401(1). The district judge found that Mr. Hill intended to prejudice a fair and impartial hearing, and we interpret this as synonymous with a finding that Mr. Hill intended to obstruct the administration of justice. The district judge did not specifically identify Mr. Hill's obstruction *qua* obstruction, but it is clear that his conduct, in sum and substance, materially and substantially obstructed the district court's administration of justice.

Mr. Hill's material obstruction of justice is apparent from the record of his repeated efforts to place in the minds of the jury answers to questions that the district judge had proscribed. He attempted three times to ask Agent Moss a question that the judge had prohibited. He repeatedly tried to evade and subvert the district judge's evidentiary ruling and, in so doing, substantially sought to undermine the district judge's ability to conduct a fair trial. His request concerning Agent Moss's examination of the financial records was a duplicitous and thinly veiled effort to evade the district court's ruling on the permissible scope of cross-examination. Mr. Hill's claim of "intimidation" was unsupported and, ironically, constituted an attempt to intimidate the district judge into giving him the leeway he thought appropriate. His efforts to undermine the authority of the judge belie any claim that he was intimidated by that same authority. Mr. Hill's pattern of obstinate conduct unfortunately diverted the attention and resources of the district court to addressing issues that were extrinsic to the question of the defendants' guilt or innocence, the business of a criminal trial.

 If the penultimate example of Mr. Hill's § 401(1) contempt was his comment in front of the jury about Agent Maloney's grades, then the resulting dispatch of the jury from the courtroom and dialogue concerning Mr. Hill's conduct was the final straw. *See Seale,* 461 F.2d at 370 ("[T]he very delay of the proceedings occasioned by a disrespectful outburst or other misbehavior may be sufficient to constitute a material obstruction."). *Cf. United States v. McGainey,* 37 F.3d 682, 685 (D.C.Cir.1994) (holding that the need for the judge to determine the prejudicial effect of contemnor's conduct was itself an obstruction of justice). We recognize that the delay caused by a contempt hearing or its ancillary events cannot alone constitute obstruction. *Oberhellmann,* 946 F.2d at 53; *Time,* 21 F.3d at 638–39 (stating that judge's investigation of alleged contempt could not form the requisite obstruction under § 401(1)). But the delay in the present case was not used to prosecute the contempt, nor was it used to investigate the circumstances surrounding the relevant conduct. Rather, it was used by Judge Zagel both to admonish Mr. Hill to abide by the orders of the court and to remind Mr. Hill that he could perfect on appeal any claims that those orders were somehow improper.

## IV

The contumacious conduct of Mr. Hill in this case certainly was not the most egregious to have occurred in a trial courtroom. Yet it demonstrates a misguided unwillingness to "play by the rules" that undermines the ability of the judge to ensure that dis-

putes in federal court are fairly and efficiently resolved under the rule of law. Mr. Hill unwisely chose an obstructionist course that appropriately led to punishment by contempt.

The judgment of the district court is AF-FIRMED.